Oliver D. Smith
7 Aldenham Road
Radlett, Hertfordshire
WD7 8AU, England
+ 44  07769176821
oliveratlantis@gmail.com

Pro se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLIVER D. SMITH<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br><br>SUBSTACK, INC.,<br><br>JOHN DOE<br><br>　　　　　　Defendants. | Case No. 3:24-CV-00727-AGT<br><br>**OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br><br>Date:　　　November 8, 2024<br>Time:　　　10:00 a.m.<br>Courtroom:　A; 15th Floor<br>Judge:　　　Hon. Alex. G. Tse |

## BACKGROUND

Plaintiff Oliver D. Smith ("**ODS**") filed a second amended complaint (ECF No. 39) ("**SAC**") following deficiencies in his first amended complaint ("**FAC**") after judge Hon. Alex G. Tse granted him leave to amend to add a claim of promissory estoppel (ECF No. 38, p. 7 "Other Claims"). ODS added another claim, deceit under California Civil Code (s. 1709, 1710); negligent misrepresentation, nondisclosure and a false promise (ECF No. 39, pp. 10-12). Defendant Substack Inc., ("**SI**") filed a motion to dismiss the SAC (ECF No. 44). ODS now files an opposition to motion to dismiss the SAC. The Defendant seems to have abandoned a Section 230(c) immunity defense (ECF No. 44, pp. 1-2).[1]

---

[1] Defendant's motion to dismiss the SAC mentions s.230 only 7 times compared to 68 in their motion to dismiss the FAC.

# ARGUMENT

## I. PROMISSORY ESTOPPEL

SI argues that ODS has failed to state a claim for promissory estoppel and does not plead any of the four elements required (*U.S. Ecology Inc. v. State of California*, 129 Cal. App. 4th 887, 901 (2005). The Plaintiff maintains this is incorrect and will rebut SI's points in five subsections (A to E).

### A. SUBSTACK'S PROMISE TO PLAINTIFF WAS CLEAR AND UNAMBIGEOUS

Substack's automatic chatbot told ODS the following when he accessed it between February-May 2024 and asked: "Do you respond to complaints?" and "Do you always respond to complaints?":

"Yes, we do respond to complaints." / "Yes, we always address complaints."[2]

Similarly, when ODS asked: "Do you respond [always/certainly] to emails?":

"Yes, we do respond to emails."[3]

SI alleges ODS did not include the "full quotes" (or included abbreviated or brief paraphrases) in his SAC (ECF No. 39, p. 8), yet the relevant quotations just added an extra 5 words to "Yes". The only omitted sentence to these responses was asking about further assistance after clearly stating that complaints and emails are responded to even when asked if "always". It should be noted that if you now type the above similar questions into the Substack chatbot, you receive very different responses:

"Yes, we take all complaints seriously and strive to address them promptly."

"No need to wait for an email! I can assist you right now. What can I help with?"[4]

---

[2] See Exhibit 1.
[3] See Exhibit 1.
[4] See Exhibit 2.

Substack appear to have amended their responses to further damage control after already adding a chatbot disclaimer as a pop-up.[5] The chatbot has farcically gone from saying it will answer emails to "no need to wait for an email!" and from saying it will answer complaints, to saying it will "*strive to address them*" (promptly). These changes are very recent; they must have taken place not long after ODS filed his SAC since the Plaintiff checked the chatbot when he wrote his SAC (to type the same questions), as well as relied on screenshots he took with the chatbot from May 2024 and recalled from memory months earlier (ECF No. 39, pp. 5-6). Plaintiff has proof the chatbot was changed for these questions because he has screenshots dated from May 2024 and on 19 August 2024 (Exhibit 1) when filing the SAC, which show different responses to a recent screenshot on 5 October 2024 (Exhibit 2).

ODS can only describe SI's accusation he was "trying to game the chatbot while varying the phrasing of his questions" for "manipulating" (ECF No. 44, p. 5) as psychological projection since it is Substack Inc., who are engaging in the dirty tricks – to constantly modify their chatbot while these legal proceedings are occurring, first by adding a disclaimer, second, modifying answers to questions. ODS' wording was quite simple e.g., "Do you respond to complaints?" and "Do you always respond to complaints?". These can hardly be misconstrued as written in bad faith, to "game the chatbot". SI quotes ODS' opposition to their motion to dismiss the FAC, to argue "…these statements plainly do not reflect a clear and unambiguous promise to always respond to all inquiries, and certainly not within any particular time frame." (ECF No. 44, pp. 3-4). This has minimal relevance to the SAC since these other statements pertain to *reports* (about ToS) such as *content violations* (ECF No. 32, p. 13) and not *complaints*. ODS made this distinction clear in his SAC at paragraph 15 (ECF No. 39, p. 6). This has been overlooked by SI who inaccurately conflate reports with complaints when ODS got different answers. The distinction between reports (such as content violations) is these primarily

---

[5] The chatbot was added in June or July 2024 (ECF No. 39, pp. 6-7).

relate to third-party content (i.e., blogs/newsletters hosted by SI) and are investigated by Substack's "Trust and Safety" team (SI's "Trust and Safety" almost exclusively deals with users and third-party content such as violation of content guidelines[6]), in contrast, the complaints largely refer to SI itself as an interactive computer service (service provider). This was clarified by ODS (ECF No. 39, p. 6):

> "Substack further says it responds to **reports** (such as **content violations**) which is what ODS mentioned (with examples from May 2024) in his objection to motion to dismiss (ECF No. 32, pp. 13-14). Those were not **responded to either**." (emphasis added)

The reason ODS focused on complaints in his SAC (at paragraph 14) opposed to T&S reports is because he is not treating Substack as a publisher of third-party content. Complaints included emails about SI failing to respond to an emergency disclosure request, failure to respond to separate inquiries as well as an inquiry or complaint about why SI had not responded or investigated the disabling of an email[7] used to register the Cancel Watch ("**CW**") newsletter/blog (the latter relates to the registrant or sign-up email and not the CW newsletter itself as third-party content). Furthermore, ODS has long made this distinction between reports of third-party content and complaints about different issues; he highlighted their heterogenous nature in his opp. to mot. dismiss FAC (ECF No. 32, p. 13) in which he distinguished reports about third-party content (i.e., "requests to take down content") and separate emails about different issues including SI's "failure to communicate" or about emergency disclosure.

Finally, even if the answers for queries/complaints about SI and reports concerning third-party content are conflated this does not much help the Defendant's argument. The two chatbot responses they assert are ambiguous in their mot. to dismiss the SAC are only made to look that way by quoting

---

[6] https://support.substack.com/hc/en-us/sections/4404983260052-Trust-Safety [last accessed 05.10.2024].

[7] Disabled by Proton Mail on 4 August 2023 (cancel.watch.account@proton.me).

out of context some sentences. For example, the Defendant in their mot. does not quote the opening sentence (at least not entirely): "**Yes**, Substack's Trust & Safety team does respond to inquiries and reports" (emphasis added). There is no ambiguity about whether they will respond; the uncertainty is about the *timeframe* of response: "They aim to review each report within 72 hours. However, while they work on resolving issues, they might not provide detailed updates or specific outcomes due to privacy and confidentiality considerations." (there is no suggestion here SI will not respond *at all*, only that responses might not be "detailed" or have "specific outcomes"). However, in ODS's case – Substack never responded. This is evidence SI's chatbot is highly inaccurate which is why they rushed to damage control, to add a disclaimer after ODS raised this issue in these proceedings (ECF No. 39, p. 7 at paragraph 18, "Chatbot limitations – "Our support chatbot is an automated service provided as a convenience you understand that support chats may provide inaccurate or incomplete information.")

SI in their mot. dismiss SAC fail to quote the following key sentence on the chatbot about "Trust and Safety" team responding: "If it's been longer than this [72 hours], I recommend checking your email spam or junk folder to ensure their response hasn't been misdirected there". The reality is for many reports/queries about third-party content ODS sent, concerning libel, blackmail, harassment, and so on, SI, never once responded; ODS checked his spam/junk folder, and he waited a lot longer than 72 hours. In fact, he waited several *months* and did not receive a single answer by email, nor did SI have courtesy to respond to ODS's complaints about separate issues including unreasonable service (their lack of communication, non-cooperation with a criminal investigation etc) and CW's registrant email suspension ("between July and September 2023… [and] on 23 October 2023. None of his complaints or queries about CW and its suspended email address were responded to." (ECF No. 39, p. 5). Overall, ODS stands by his SAC in which he claimed, "Substack clearly and unambiguously said they would respond to all emails and complaints when asked by ODS" (ECF No. 39, pp. 7-8, [at paragraph 19]).

B. **HOW THE PLAINTIFF'S POSITION CHANGED**

SI points out that ODS in his SAC did not plead a "reliance on the promise to his detriment" or show how his "position changed" after relying on the promise citing the case *Maomanivong v. Nat'l City Mortg. Co.*, No. C-13-05433 DMR, 2015 WL 217347, N.D. Cal, Jan. 15, 2015, at *10[8] ("None of Plaintiff's changes or additions addresses how Plaintiff's circumstances changed.") Admittedly, ODS did not explain this in his SAC, however, it can be rectified. As noted in the SAC, ODS filed a complaint to the Hertfordshire police against Cancel Watch (CW) on 27 June 2023 (originally about threats made on social media, but a few weeks later the complaint was updated, to include blackmail i.e., the CW blog/newsletter[9]). ODS then sent numerous emails to Cancel Watch, asking for assistance in identifying the anonymous owner of CW and to cooperate or help (in any way) with the criminal investigation and sent multiple other queries. Substack Inc., never responded. ODS gave up trying to communicate with Substack by November 2023, having sent a final letter by post on 23 October 2023 (ECF No. 39, p. 5). ODS closed his criminal complaint by the end of the year; arguably SI's lack of communication impeded the investigation. The owner of CW remains anonymous (SI have CW's IP-address which could unmask them, but they have chosen not to disclose it, protecting the blackmailer).

Plaintiff later found a method to communicate with Substack on their chatbot in February to May 2024 and therefore resorting to relying on it as he explained in the SAC (this follows having exhausted every other method including trying to even phone Substack Inc., see paragraphs 11-13 of the SAC). After the chatbot had made promises, they would respond to ODS' complaints and emails (including an emergency disclosure), he filed a new criminal complaint against CW (and its suspected owner[10])

---

[8] https://casetext.com/case/maomanivong-v-natl-city-mortg-co/

[9] ODS was threatened and blackmailed in June 2023; the blackmail appeared on the CW newsletter/blog on 5 July 2023.

[10] Emil Kirkegaard (see ECF No. 39, p. 14). ODS suspects but does not have proof that Kirkegaard is the owner of CW.

under the Malicious Communications Act 1988 (under "harassment"). ODS' criminal complaint was filed on 23 April 2024 (Exhibit 3). Had SI not made the promises of responding to ODS's emails and complaints on their chatbot (e.g., "Yes, we do respond to emails.") he would have not filed the second criminal complaint. It is clear therefore that ODS's position did change upon relying on the promises the chatbot made to him. This was a consequent detrimental change of position: had ODS not relied upon the promises made he would not have filed a criminal report to the police. Substack Inc., failed to respond (even after the criminal report was filed); ODS after waiting weeks, closed his complaint. All of this has not only wasted ODS's time and caused him emotional distress but wasted police time.

C. **REASONABLENESS OF RELIANCE**

SI argues the reliance ODS had on the chatbot responses, "would not be reasonable" based on "equivocal" responses he received (ECF No. 44, p. 10). As already explained, the Defendant conflated questions directed on the chatbot to the Trust & Safety team about third-party content with separate complaints or queries about Substack Inc., as a service provider. However, the answers ODS received about the former were not equivocal: "**Yes**, Substack's Trust & Safety team does respond to inquiries and reports." (emphasis added). As mentioned above, the only ambiguity in these two responses was the *timeframe* of responding, not that SI's T&S team would *not* respond. The Plaintiff, however, has clarified that he is not relying on responses the chatbot provided about content violations but separate issues entirely (there is no doubt these other responses on the chatbot were clear and unambiguous[11]).

The Defendant further argues that it would not be reasonable for the Plaintiff to have relied on chatbot responses about whether SI responded to complaints (or emails) because ODS had previously

---

[11] In their motion to dismiss the SAC, the Defendant does not even argue these other chatbot responses were ambiguous because it is clear they were not e.g., (Q.) "Do you [always] respond to emails?", (A.) "Yes, we do respond to emails." Instead, they only focused on chatbox responses mentioned in the earlier FAC, which are largely irrelevant to the SAC.

"given up trying to contact Substack". This argument is a non-sequitur. As explained in the SAC, ODS gave up trying to communicate with Substack Inc., after they failed to respond to dozens of his emails and complaints (including a letter he mailed) from July to (late) October 2023 (by November 2023, ODS had stopped communication). However, ODS later found another method to communicate with SI i.e., the chatbot in February 2024. Based on this *new* method of communication (which he further relied on since it was different), he used the chatbot sporadically throughout February to May 2024 and filed a second criminal complaint in April 2024 to Hertfordshire police based on promises the chatbot made about responding to his emails or complaints, including to an emergency disclosure request. In other words, while the Plaintiff had "given up" this was only temporary, and he resumed communication months later when he stumbled across the chatbot. It does not follow that ODS would not have relied on the chatbot promises, on the contrary, since the chatbot at the time had no disclaimer warning the chatbot might provide inaccurate information – he relied on the answers, not least because the chatbot responses were clear and unambiguous statements; he had no reason to doubt them at the time. A chatbot disclaimer was added in June or July 2024 to damage control (ECF No. 39, pp. 6-7).

The Defendant's argument is also untenable considering the fact the Plaintiff had tried to contact Substack Inc., about place of service (ECF No. 39, p. 5 at paragraph 12). ODS hired a process server who tried to contact SI by phone in March 2024 (but this failed since their phone was disconnected). Subsequently, the Plaintiff used the chatbot to confirm where to send legal documents/where to send his process server in person. However, it turned out the chatbot provided more false information (ECF No. 36); see also the process server's affidavit (ECF, No. 8) about the non-service. ODS relied on the chatbot to serve legal documents, as well as to get answers about his queries, complaints and emails. This reliance was reasonable. The Defendant's accusation ODS was somehow trying to "manipulate" the chatbot is preposterous but not unexpected in light of them sending frivolous legal threats about DMCA takedown requests in an attempt to persuade ODS to dismiss the lawsuit (ECF No. 39, p. 3).

D.  **SUBSTACK'S TERMS OF USE**

SI argue that ODS could not have had reasonable reliance on the statements SI's chatbot provided because there was an earlier disclaimer already in place when ODS created his account on Substack. This disclaimer notes that Substack "will not be responsible for the accuracy. . . of material contained on our products and services." (ECF No. 44, p. 6). This disclaimer, however, they concede was not a pop-up on the chatbot when ODS accessed it from February to May 2024 (the pop-up was added in June or July 2024) but appeared as a "general Terms of Use applicable to Substack account holders" (ECF No. 44, p. 6). According to an exhibit attached to ECF No. 44; a Substack Inc., employee said:

> "During the process for creating or setting up a Substack account, a user is presented with a screen stating that by continuing, the user agrees to the terms of service, with a hyperlink to the Terms of Use. In order for an account to be created or an account profile to be set up by a user, the user must continue by clicking through on a button on this screen."

This is **not** true. If you create or sign up an account, you are not presented with a hyperlink to SI's Terms of Use on a "screen stating by continuing" but instead a hyperlink to a different page titled "Publisher Agreement." (Exhibit 4). To navigate to ToU a user must then click on a separate hyperlink on the "Publisher Agreement" page. In other words, during the process of an account creation a user must click on *multiple* hyperlinks to access the ToU to find the aforementioned disclaimer (which is itself a long way down the page). It is not a reasonable expectation that an average user would click on multiple hyperlinks and read/scroll through lots of text to read this disclaimer. ODS never did this. Suffice to say the statement by the Substack Inc., employee is disingenuous. Furthermore, it should be noted that SI modified their disclaimer in a bold font. The disclaimer was previously in an ordinary font. Compare a version of the ToU attached by Defendant dated 25 September 2024 to the screenshot ODS has attached dated to 30 June 2021 (Exhibit 5) [note that ODS created his SI account in 2021].

Finally, the version of the ToU, SI attached (dated 25 September 2024), misleadingly, contains a hyperlink to a URL titled "Support Chatbot Terms". This URL/hyperlink was completely **absent** when ODS created an account on Substack in 2021. In fact, it was absent until recently. For example, the version of ToU dated 2 May 2024, with a screenshot dated 1 June 2024, contained no such URL.[12] This is because the chatbot disclaimer was not then in existence which ODS has already proven in his SAC (ECF No. 39, p. 6). Overall, you cannot really trust Substack Inc., as far as you can throw them. Their two attachments including statement by a Substack Inc. employee are demonstrably inaccurate.

### E. PLAINTIFF'S CLAIM FOR DAMAGES

The Defendant notes the Plaintiff must "plausibly allege that he was 'injured by his reliance'" and that "his claimed damages were caused by his reliance on the purported promise." The Plaintiff should have included nominal reliance damages in his SAC; unfortunately, he forgot to do this. These nominal reliance damages would cover the costs ODS spent on a mobile phone conversation with the police since as mentioned he filed a criminal complaint to Hertfordshire police based on the promises the chatbot made. This means his claim for reliance damages are wasted expenses. The Plaintiff stands by his claim for emotional damages but was mistaken, in the SAC, when writing: "in the absence of an independent or accompanying tort claim, emotional distress damages are not recoverable" (ECF No. 39, pp. 9-10, at paragraph 23). He now understands this to be incorrect and retracts this statement. Emotional (mental anguish) damages **are** recoverable in a promissory estoppel or breach of contract claim but they require very exceptional circumstances; see *Erlich v. Menezes* (1999) 21 Cal. 4th 543, 558. The Defendant quote-mines the latter case law without any citation (ECF No. 44, p. 7). It is the Plaintiff's view because SI's promises on their chatbot led ODS to file a police report and this led to wasting his and the police's time (having a serious consequence) that this is such an exceptional case.

---

[12] https://web.archive.org/web/20240601024738/https://substack.com/tos/

## II. DECEIT

ODS concedes that he has failed to state a claim for deceit and withdraws this (second) claim in his SAC (ECF No. 39, pp. 10-12). Plaintiff mistakenly added this claim based on a judgment in the US District Court for the District of Minnesota.[13] Apparently under Minnesota law, emotional distress damages in a promissory estoppel claim can be recovered, if there is an independent or accompanying tort claim hence why ODS added deceit. The Plaintiff is unsure if this is applicable under Californian law (it probably is not). In good faith, he will not waste the Court's time, trying to defend this claim.

## **CONCLUSION AND REQUEST FOR LEAVE TO AMEND**

The Plaintiff requests if the judge is not satisfied with ODS's pleading for promissory estoppel in his SAC and the corrected deficiencies in this opp. to mot. dismiss the SAC – he be granted leave to amend his complaint one final time. ODS believes this would be fair and he be granted one more chance given the fact the Defendant has filed an incorrect statement by a SI employee which in ODS's opinion is borderline perjury. The hypothetical third amended complaint ("**TAS**") shall only have one claim against Substack Inc. (promissory estoppel). ODS, however, believes that he has made a strong case for promissory estoppel already above and his claim fulfills the elements required for promissory estoppel. He is though willing to expand on all these in the TAS (if the judge grants leave to amend).

Dated: 07.10.2024 (7 October 2024)

Oliver D. Smith,
Pro se.

---

[13] *Deli v. University of Minn.*, 578 N.W.2d 779, 782 (Minn. Ct. App. 1998).